**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 30, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2504**

**STATE OF WISCONSIN**

Cir. Ct. No. 2010FA160

**IN COURT OF APPEALS**
**DISTRICT IV**

IN RE THE MARRIAGE OF:

MICHAEL S. EISENGA,

    PETITIONER-APPELLANT,

V.

CLARE A. HAWTHORNE,

    RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Columbia County: TODD J. HEPLER, Judge. *Affirmed in part, reversed in part and cause remanded for further proceedings.*

Before Graham, P.J., Blanchard, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  This is an appeal of a postjudgment decision in a divorce proceeding.  On appeal, Michael Eisenga challenges two decisions that the circuit court made without holding an evidentiary hearing: a decision to issue a "charging order" pursuant to WIS. STAT. § 183.0503 (2023-24) that placed a lien on Eisenga's membership interests in several limited liability companies, and a decision to deny Eisenga's motion for a modification of a provision in the divorce judgment that set a floor below which his monthly child support obligation would not fall.[1]  We reject Eisenga's arguments with respect to the charging order and affirm that order, but we reverse the court's decision with respect to the motion to modify the child support floor because the court denied the motion based on a mistaken view of the law.  We remand for further proceedings on the modification motion.

## BACKGROUND

¶2     Eisenga and Hawthorne were married in September 2004.  Three children were born of the marriage, one in 2006, the second in 2007, and the third in 2009.  During the marriage, Eisenga ran several limited liability companies that he owned, and Hawthorne was a stay-at-home mother.

¶3     Eisenga filed a divorce petition in May 2010.  The circuit court ordered alternative dispute resolution and the parties participated in binding arbitration.  The arbitration and subsequent circuit court and postjudgment proceedings, including three prior appeals to this court, provide important

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

background for the motions and orders that are the subject of this appeal. We summarize aspects of those proceedings here.

**The Arbitration and Stipulated Judgment of Divorce**

¶4 The arbitrator issued a decision that resolved all of the contested issues in the divorce. One of those issues was whether a marital property agreement (sometimes referred to as a prenuptial agreement) that was signed by the parties shortly before their marriage was enforceable. The arbitrator determined that it was. As a result, under the terms of the marital property agreement, which the arbitrator enforced, Hawthorne would not receive spousal maintenance from Eisenga, and Eisenga's individual property, which was valued at approximately $30 million, was not subject to property division.

¶5 Regarding child support, the arbitrator ordered that, "until further order of the Court based upon three minor children," Eisenga would pay Hawthorne 29% of his income. This provision was based on the statutory percentage of income guidelines and the high-income payor calculations set forth in Wisconsin's administrative code. *See* WIS. STAT. § 767.501; WIS. ADMIN. CODE §§ DCF 150.03(1) and 150.04(5). The amount of child support for 2011 was determined to be $18,000 per month, and it could be reset annually based on information about Eisenga's income from the prior calendar year.

¶6 Separately, the arbitration award included a provision that set a "base floor" child support payment of $15,000 per month:

> Notwithstanding all of the above, there shall be a base floor established for child support in the amount of $15,000 per month for three children payable by [Eisenga] to [Hawthorne], because of his substantial separate estate, because the Arbitrator finds that the prenuptial agreement contemplates that [Hawthorne] will remain a stay-at-home

> mother, and because [Eisenga] has the ability to pay such base child support out of his separate estate in the event that his income does not support such an award.

Under this provision, which we refer to as the child support floor, Eisenga's payments would not fall below $15,000 per month, regardless of his income.

¶7 Finally, the arbitration award included a provision addressing when Eisenga's obligation to pay child support would terminate:

> The child support obligation shall terminate entirely when all three children have become emancipated, reached the age of majority after having acquired a high school diploma or its equivalent, or have reached the age of 19 years while pursuing an accredited course of instruction leading to the acquisition of a high school diploma or its equivalent.

¶8 The case proceeded to a stipulated divorce hearing, at which the parties submitted the arbitrator's award and asked that it be incorporated into the judgment of divorce. Consistent with this request, the circuit court issued a judgment of divorce that incorporated the contents of the arbitrator's award. Neither party appealed the judgment of divorce.

**Eisenga's 2012 Motions to Modify Child Support
and to Strike the Child Support Floor**

¶9 Then, in February 2012, less than a year after the divorce judgment was issued, Eisenga filed a motion to reduce his child support obligation. Eisenga claimed that his annual income had fallen substantially—from approximately $1.2 million to approximately $230,000—due to changes in the mortgage banking industry. Eisenga also filed a separate motion asking the circuit court to strike the provision in the judgment of divorce that established the child support floor as contrary to public policy. The parties robustly briefed issues regarding the floor,

4

including whether it violated public policy and whether Eisenga had forfeited the right to challenge it on public policy grounds.

¶10 Judge Alan White, the circuit court judge who presided over the proceedings on Eisenga's 2012 motion, issued an order denying the motion on August 14, 2012. The language and rationale in that order are important to the resolution of the current appeal, and we follow the parties' lead in referring to the decision as the "2012 order" or "Judge White's order."

¶11 In the 2012 order, the circuit court determined that Eisenga had forfeited his right to challenge the child support floor. This was so, the court determined, because Eisenga did not object to the provision during the arbitration proceedings and because he did not challenge that part of the arbitration award when the judgment was entered in accordance with WIS. STAT. ch. 788, which provides standards for challenging arbitration awards. The court observed that it was "not surprising" that Eisenga declined to challenge the award, given that Eisenga had obtained substantial benefit from the arbitrator's decision to uphold the marital property agreement. The court further observed that the arbitrator set the child support floor based on the rationale that, "whatever [Eisenga's] income may be for a given year," he would be able to pay a substantial amount in child support based on the approximately "$30 million or so in separate assets" that he was allowed to retain pursuant to the marital property agreement.

¶12 Despite Eisenga's forfeiture, the circuit court went on to address the parties' arguments about public policy. The court determined that the child support floor did not violate public policy, in part because the court "retains the power to modify this award under limited circumstances even though no appeal was taken at the time the judgment was entered." The court explained:

5

[The arbitrator] created the baseline child support not on [Eisenga's income] (that support was found to be $18,000 per month … ) but because [Eisenga] was awarded an extremely high amount of separate property under the prenuptial agreement …. Of course the court would be able to analyze what occurred to deplete his separate estate if a change in the floor was requested. Presumably, [Eisenga] could not be at fault in its reduction. For example, if a large portion of the separate estate was held in stocks and a stock crash occurred substantially reducing his ability to pay the basement figure the court retains the power to change his monthly support.

The court here relies on the fact that the support award made by the arbitrator was based on two things, 1) [Eisenga's] high income level and, 2) the value of [Eisenga's] separate estate. To the extent the arbitration decision can be read to disallow any reduction, ever, it is found infirm. … However, it does not seem to this court that public policy should prohibit the basis on which the award was made. This case presents a set of extraordinarily unique circumstances and income levels. To find that a [presumptive child support floor] could be warranted by one part[y's] extraordinary wealth does not strike this court as violating public policy and the court so holds.

(Emphasis omitted.) Separately, the court also concluded that, to the extent that the arbitration award "may appear to not allow for reconsideration of support in the event of a change of placement or upon any minor achieving the age of majority," that aspect of the award would be "considered null and void."

¶13 At a hearing the following month, the circuit court clarified the intended meaning of the 2012 order. Specifically, the court confirmed that, although it retained the authority to modify the $15,000 per month floor under limited circumstances, it had determined that no modification was warranted based on Eisenga's allegations about his reduced income. Following this clarification, Eisenga and Hawthorne stipulated that Eisenga's child support obligation should

be reduced from $18,000 per month to the $15,000 floor. The court reduced Eisenga's monthly obligation accordingly.

¶14 Eisenga appealed the 2012 order. In our decision, *Eisenga v. Eisenga* (*Eisenga I*), No. 2013AP91, unpublished slip op. (WI App Oct. 3, 2013), we first addressed Eisenga's arguments about his motion to strike the provision imposing the child support floor, and we agreed with the circuit court's determination that Eisenga forfeited his right to challenge it. *Id.*, ¶¶22-24. Therefore, we concluded, there was no need to address Eisenga's arguments that the provision violated public policy, that it was inconsistent with the requirement that parents pay a fair amount to support their children's needs, or that it resulted in "hidden maintenance" to Hawthorne. *Id.*, ¶25.

¶15 We then turned to Eisenga's arguments about his motion to modify child support. We concluded that the circuit court's determination that the court retained the authority to modify Eisenga's child support obligation under "limited circumstances" was consistent with WIS. STAT. § 767.59(1f), which allows a modification of child support based on a "substantial change in circumstances." *Id.*, ¶¶26-28. And we agreed with the circuit court that Eisenga had not shown a substantial change in circumstances—he had been "awarded an extremely high amount of separate property under the prenuptial agreement," and he was not requesting a change in that level based on any depletion of his separate estate. *Id.*, ¶¶29-32.

**Eisenga's 2018 Motion to Modify Support and Hawthorne's 2019 Motion for Contempt**

¶16 Following our decision in *Eisenga I* and over the next several years, the parties continued to engage in postjudgment litigation on various subjects. For his part, Eisenga filed a number of motions about various aspects of the divorce

7

judgment and appealed some of the circuit court's decisions, but he did not file another motion to modify child support until August 2018 (the "2018 motion"). Eisenga's 2018 motion, which we describe below, ultimately led to an appeal and a decision from this court that we refer to as ***Eisenga II***. *See **Eisenga v. Hawthorne** (**Eisenga II**)*, No. 2020AP1404, unpublished slip op. (WI App Dec. 23, 2021). It also led, indirectly, to a contempt motion, and ultimately to an attorney fee award, which was appealed, and a decision from this court that we refer to as ***Eisenga III***. *See **Eisenga v. Hawthorne** (**Eisenga III**)*, No. 2021AP1114, unpublished slip op. (WI App Mar. 23, 2023).[2]

¶17    In his 2018 motion, Eisenga argued that there had been a substantial and unforeseeable change in circumstances that warranted a modification below the $15,000 per month floor. He averred that his monthly income had declined significantly since the divorce, in part because one of his businesses was no longer operating. He also averred that he was having to draw down assets from his business activities in order to meet the child support obligation, and that the drawdowns would hamper his ability to generate future income. According to Eisenga's affidavit:

> If I am forced to continue using assets, invading my personal estate, and taking out loans, I will be unable to continue to operate my businesses at a sufficient level, let alone make the necessary investments and risks that drive business success. I am essentially selling off the viability of my businesses to make future income by becoming over leveraged in the present to pay child support.

---

[2]  Eisenga also pursued one other postjudgment appeal in this divorce action, ***Eisenga v. Eisenga***, No. 2016AP1946, unpublished slip op. (WI App Oct. 5, 2017), but that appeal does not directly pertain to the issues that are the subject of this appeal.

¶18    Following the filing of the 2018 motion and for the next 14 months, the attorneys for both parties filed a flurry of motions and letters in the circuit court on various topics related to discovery and scheduling. Among other things, there were multiple disputes over the timing of a hearing, the scope of discovery into Eisenga's financial circumstances that Hawthorne was entitled to, and whether the information that Eisenga disclosed was adequate.

¶19    Meanwhile, starting no later than December 2018, Eisenga began making monthly child support payments that were substantially less than $15,000. In July 2019, Hawthorne moved for an order finding Eisenga in contempt for failing to pay court-ordered child support.

¶20    In October 2019, the circuit court, Judge Todd Hepler presiding, held an evidentiary hearing at which it addressed both motions. Eisenga and his accountant both testified at the hearing and attempted to demonstrate that Eisenga's assets had declined in value. In response, Hawthorne presented evidence and argument that, around the same time Eisenga was representing that his assets had little or no value in this family court action, he was making inconsistent representations to banks about the significant value of the assets.

¶21    In February 2020, the circuit court issued an order that denied the 2018 motion to modify child support. In its written decision, the court contemplated that Eisenga might be entitled to a modification if he could demonstrate a substantial change in the value of his assets, but that he had not made that demonstration:

> During the hearing Mr. Eisenga spent a great deal of time and resources attempting to show significant declines in the value of his assets and arguing that his child support obligation should be based on his income. At one point,

> Mr. Eisenga even argued that his income was negative and he should have no child support obligation at all.
>
> Ms. Hawthorne questions the timing and credibility of the information presented at trial … noting that on June 30, 2018 Mr. Eisenga represented his net worth was $36 million, however only a few months later and shortly after filing his motion to reduce his child support obligation he reported his net worth at negative $2 million.
>
> The parties … spent very little time discussing the contrast between his current financial situation to that which existed at the time of the divorce. This is particularly important in this case because the child support floor is based on Mr. Eisenga's assets. In order to establish a substantial change in circumstances, the court must examine Mr. Eisenga's assets at the time of the divorce and compare them to the time his motion was filed.

(Emphasis omitted.)

¶22 Ultimately, the circuit court found that Eisenga's representations to the court were "inconsistent" with "his representations to potential lenders" and "lacking in credibility." The court also discredited the testimony of Eisenga's accountant, which was "based largely on" Eisenga's representations to the accountant and "not deserving of credibility." Without credible financial information, the court explained, it was difficult to determine the value of Eisenga's assets. Under the circumstances, Eisenga failed to meet his burden to establish a substantial change in circumstances.

¶23 The circuit court also found that Eisenga was in contempt based on his failure to make his child support payments. Based on the evidence at the hearing, the court found that Eisenga "had the ability to pay his child support obligations and that he willfully failed to do so." The court ordered the parties to submit letter briefs to address the conditions that would be required to purge Eisenga's contempt.

¶24   Eisenga appealed, *see Eisenga II*, No. 2020AP1404, and on appeal, he challenged the circuit court's ruling on his modification motion. Specifically, Eisenga argued that the court failed to consider WIS. STAT. § 767.59(1f)(b)2., which provides that when, as here, the amount of support is not expressed as a percentage of the payor's income, there is a rebuttable presumption that the passage of thirty-three months is a substantial change in circumstances sufficient to justify a revision. *Id.*, ¶¶4-5. We disagreed with Eisenga's framing of the issue, *id.*, ¶6, and we affirmed the court's ultimate determination that the child support order should not be revised because Eisenga did not provide credible financial information, *id.*, ¶9. In the absence of credible information from Eisenga, we were satisfied that the court did not erroneously exercise its discretion by leaving the existing child support order in place. *Id.*

¶25   Meanwhile, back at the circuit court, the disputes between the parties continued. As mentioned, the court had ordered the parties to submit briefs to address the amount Eisenga should be required to pay to purge his contempt, but a determination on that topic was put on hold because Eisenga filed a petition for bankruptcy. Then in July 2020, after Eisenga voluntarily dismissed his bankruptcy petition, the court held a hearing and ordered Eisenga to pay $235,000 in child support arrearages. To facilitate the payment, it ordered Eisenga to transfer a second property (a multimillion-dollar lake home) to Hawthorne, so that she could manage its sale. The circuit court would hold additional proceedings at a later date regarding the amount of Hawthorne's litigation fees that Eisenga would be required to pay as an additional sanction for his contempt.

¶26   Shortly thereafter, Eisenga's attorney filed a letter asking the circuit court whether Eisenga could be excused from transferring the lake house to Hawthorne if he came up with enough money to pay his outstanding child support

arrearages. Then, on or around July 28, 2020, Eisenga made a $260,000 payment that zeroed out his arrearages, and he asked the court to issue an order stating that this payment "abrogate[ed] and void[ed] any other purge conditions previously ordered." After considering competing motions by the parties, the circuit court did not require Eisenga to transfer the lake house to Hawthorne.

¶27 However, on the topic of additional sanctions, the court determined that Eisenga would be responsible for paying the litigation costs that Hawthorne incurred from bringing her contempt motion. What followed was another flurry of motions and letters on various topics, including disputes over the scope of Eisenga's discovery into Hawthorne's litigation costs. Ultimately, the court determined that Eisenga was required to pay approximately $106,000 towards Hawthorne's litigation costs and issued a judgment in 2021 for that amount (the "2021 litigation costs judgment"). Eisenga appealed and Hawthorne cross-appealed, and we issued a decision in due course that affirmed the 2021 litigation costs judgment. *See Eisenga III*, No. 2021AP1114.

### The Current Motions for a Charging Order and for a Modification of Child Support

¶28 That brings us to the proceedings that took place in the circuit court after the court issued the 2021 litigation costs judgment. As relevant here, these proceedings include the two motions that are the subject of this current appeal: Hawthorne's 2021 motion requesting a charging order and Eisenga's 2022 motion for a modification of the child support floor. As before, there was another flurry of motions and letters on various other topics in conjunction with these motions, including discovery issues and another round of motions regarding Eisenga's alleged contempt. Ultimately, this phase of the postjudgment litigation culminated in the issuance of an order dated November 19, 2024, in which the court declined

12

to reconsider the charging order that it had previously issued and denied the motion to modify the child support floor. We now give an overview summary of the proceedings leading to the November 2024 order, and we recount those proceedings in further detail as needed in the discussion section below.

¶29     In July of 2021, Hawthorne filed a motion for a "charging order" against Eisenga's membership interests in 12 limited liability companies. As we understand it, a charging order is a court-issued order that operates as a lien against financial interests, such as distributions, that a judgment debtor might have as a result of the debtor's membership in a limited liability company. *See* WIS. STAT. § 183.0503. Here, Hawthorne filed her motion for a charging order approximately six weeks after the circuit court entered the 2021 litigation costs judgment, and she argued that a charging order would be appropriate in light of Eisenga's failure to satisfy that judgment.[3] Eisenga opposed the motion.

¶30     Meanwhile, in or around September 2021, Eisenga began serving a federal prison sentence following his criminal conviction for mortgage fraud. Then, as of January 2022, he stopped making child support payments. In February 2022, Hawthorne filed a motion for contempt.

¶31     Also in February 2022, Eisenga's father, who was managing his affairs while he was in prison, filed a motion on Eisenga's behalf to modify the child support floor. The motion asserted that more than 33 months had passed since the last child support order, and argued that there had been a substantial

---

[3] The circuit court stayed the enforcement of its litigation costs order and declined to consider the motion for a charging order while it waited for our decisions in *Eisenga II* and *Eisenga III*. After we issued our decision, the circuit court lifted the stay, Hawthorne refiled her motion, and Eisenga opposed it.

change in circumstances because Eisenga would continue to be in federal prison for a period of time and because his "current net worth [was] negative" and "there [was] insufficient cash flow in [the] businesses to continue to pay the child support currently ordered in this case." Hawthorne opposed the motion. Among other things, she argued that the record evidence showed that Eisenga's alleged decrease in assets was baseless. The reply filed on Eisenga's behalf argued that information Hawthorne was relying on was more than two years old and that the situation had changed.

¶32 After Eisenga was released from prison, the circuit court held a hearing on October 2, 2023, and the primary focus was on the pending motion for contempt. As of that date, Eisenga owed approximately $343,000 in unpaid child support.

¶33 At the close of the October 2023 hearing, the circuit court found that Eisenga was in contempt for not paying child support. It ordered Eisenga to make an immediate payment of $5,000, to pay the $15,000 that would come due in November by a specified date, and to "stay current" on future payments as they came due. The court scheduled a hearing for the following month to address the remaining motions that were pending—Hawthorne's motion for a charging order and Eisenga's motion to modify child support—but that hearing was delayed based on additional discovery disputes and other matters.

¶34 The circuit court held another hearing on the pending motions in February 2024. At that hearing, it was determined that Eisenga was current on recent payments that came due since the prior hearing, but Eisenga had not paid his arrearages, nor had he paid the 2021 litigation costs judgment.

¶35 Also during the February 2024 hearing, the circuit court indicated that it would issue a charging order based on the arguments made at the hearing, but that it would defer its decision on the modification motion. Following the hearing, Hawthorne filed a proposed charging order, Eisenga objected to its form, and the circuit court entered the order that Hawthorne had submitted. Eisenga then filed a motion for reconsideration of the charging order, and he filed a brief on his motion to modify the child support floor. Hawthorne opposed both motions. The court held another hearing on July 31, 2024, and issued a written decision and order on November 19, 2024. The November 2024 order denied the motion to modify child support and declined to reconsider the charging order. This appeal follows.[4]

## DISCUSSION

¶36 On appeal, Eisenga challenges the circuit court's entry of the charging order and denial of his motion to reconsider that order, and he also challenges the court's denial of his motion to modify the child support floor. Eisenga does not go so far as to argue that the court was required to deny the charging order and grant his modification motion based on the record facts. He instead makes a more limited argument—specifically, he argues that the circuit

---

[4] Eisenga's appellate briefs do not comply with WIS. STAT. RULE 809.19(8)(bm), which addresses the pagination of appellate briefs. *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover"). This rule was amended to its current form in 2021, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), and the reason for the amendment is that briefs are now electronically filed in PDF format, and are electronically stamped with page numbers when they are accepted for efiling. The pagination requirements ensure that the numbers on each page of a brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief. Supreme Court Note, 2021, RULE 809.19.

court erred by deciding both motions in Hawthorne's favor without holding an evidentiary hearing, and he further argues that the reasons the circuit court gave for denying the modification motion without a hearing were erroneous.

## I. Hawthorne's Motion for a Charging Order

¶37    We begin with Eisenga's argument that the circuit court should have held an evidentiary hearing before it entered the charging order.  For reasons we now explain, we reject Eisenga's argument because he did not timely request a hearing on Hawthorne's motion for a charging order, and also because he fails to support his argument that he is entitled to an evidentiary hearing with citations to applicable legal authority.

### A. Additional Procedural Background Regarding the Charging Order

¶38    As noted, Hawthorne initially sought a charging order in 2021, but the circuit court proceedings on Hawthorne's motion were delayed pending our decisions in *Eisenga II* and *Eisenga III* and the circuit court proceedings regarding contempt.

¶39    The circuit court did not take up Hawthorne's motion for a charging order until the October 2023 hearing.  During that hearing, Hawthorne's attorney noted that Eisenga had not filed any response to the motion for a charging order that Hawthorne had filed more than two years earlier.  Counsel reported that he had deposed Eisenga, and based on counsel's representations about the deposition testimony, counsel made a number of assertions about Eisenga's practices of using funds from his limited liability companies to pay his personal expenses.  When Eisenga's attorney objected to these assertions, the court indicated that it would allow offers of proof.  Eisenga's attorney made his own offer of proof, asserting

16

that some of Eisenga's companies were in bankruptcy, the assets of the companies were substantially leveraged, and "the federal government has liens on … everything." Counsel further asserted: "The suggestion that [Eisenga] has this pool of money that he's able to draw from whenever he wants simply is not supported by where we are at right now."

¶40    Then, during the February 2024 hearing, Hawthorne's attorney again represented that Eisenga had not filed any objection to the motion for a charging order. Therefore, counsel argued, the motion for that order was uncontested. Eisenga's attorney did not dispute this point.

¶41    The statute that authorizes the entry of a charging order, WIS. STAT. § 183.0503(1), provides:

> On application by a judgment creditor of a member [of a limited liability company], a court may enter a charging order against the transferrable interest of the judgment debtor for the unsatisfied amount of the judgment. Except as otherwise provided …, a charging order constitutes a lien on a judgment debtor's transferable interest and requires the … company to pay over to the person to which the charging order was issued any distribution that otherwise would be paid to the judgment debtor.

As applied here, it was undisputed that Hawthorne had obtained an enforceable judgment against Eisenga and that Eisenga had not satisfied the judgment, making Hawthorne a "judgment creditor" of Eisenga. It was also undisputed that Eisenga held a membership interest in the companies identified in Hawthorne's motion.

¶42    Eisenga's attorney nevertheless argued that the circuit court should not enter a charging order for a number of reasons related to the financial situation of the companies. The attorney acknowledged that Eisenga had been taking "minimal draws to be able to make his ordinary monthly expenses," as well as the

amounts needed to cover child support payments, but asserted that most of the money being paid from the companies was to service their substantial debt loads. Counsel also argued that some of the companies were not in compliance with certain regulations about cash reserves. Counsel did not submit any evidentiary materials for the court's consideration, and did not ask for an evidentiary hearing to present any facts.

¶43     The circuit court granted the motion for the charging order at the conclusion of the February 2024 hearing. The court said:

> At this point, I am going to grant the request for a charging order given the information here. [F]rankly, I think maybe a receivership might even be a better course of action given that right now there is simply no objective, impartial information that is in front of the Court.
>
> The problem is everything is filtered through Mr. Eisenga and, obviously, there's bias and … self-interest in there. There's just no objective way for the Court to look at that. So I'm going to grant that motion to at least establish some level of stability and restraint.

¶44     Following the February 2024 hearing, Hawthorne's attorney filed a proposed draft of the charging order, and Eisenga's attorney filed a letter objecting to its form. Eisenga's attorney said that the language of the proposed order was "vague and ambiguous," and generally objected to the lack of a provision that would carve out enough money to allow Eisenga to cover his living and other expenses. Eisenga's attorney did not ask for a hearing on any of these issues.

¶45     The circuit court signed the written charging order that had been proposed by Hawthorne's attorney. That order placed a lien on Eisenga's interest in the companies "until the past due child support … and … judgments held by [Hawthorne], plus interest and legal fees, have been satisfied in full." The order directed that "[d]istributions made by [the companies] to [Eisenga's] interest in

[the companies] shall instead be paid immediately to [Hawthorne] c/o [Hawthorne's] attorney."

¶46    Eisenga then filed a motion asking the circuit court to reconsider the charging order.  It was in this reconsideration motion that Eisenga first suggested that the court was required to hold an evidentiary hearing before it issued the order.  Eisenga's argument on this topic was limited to the following conclusory sentence: "The hearing in which the Charging Order was granted was not evidentiary at all, which is required under WIS. STAT. [ch.] 180 when the court takes such a drastic step as to order a charging order."  Eisenga did not cite any specific section in Chapter 180—nor any other legal authority outside of Chapter 180—as authority for this proposition.  Nor did Eisenga identify any specific evidence that he would have produced at a hearing if one was held.

¶47    The circuit court addressed Eisenga's motion for reconsideration at the July 2024 hearing.  When asked to give argument on the topic, Eisenga's attorney indicated that he would stand on his motion to reconsider, and reiterated that the court had not held an evidentiary hearing.  Counsel again asserted: "WIS. STAT. [ch.] 180 clearly requires an evidentiary hearing to grant a charging order. The Court did not take that step."  Again, counsel did not cite any specific statute or other authority to support this assertion, nor did counsel identify any evidence that would be produced at a hearing.  The court indicated it would take the motion for reconsideration under advisement, and its November 2024 order provided that the court "decline[d] to reconsider" the issue.

**B.  Analysis Regarding the Charging Order**

¶48    As a general rule, a party forfeits an issue or argument for appellate review if the party fails to raise that issue or argument in a timely manner in the

circuit court. *See* ***Schill v. Wisconsin Rapids Sch. Dist.***, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177.  The rule against forfeiture gives the parties and the circuit court notice and a fair opportunity to address issues and arguments, enabling courts to avoid or correct any errors with minimal disruption of the judicial process.  ***State v. Ndina***, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612.  The rule also encourages attorneys to diligently prepare for and conduct court proceedings, prevents them from "sandbagging" opposing counsel or the court, and avoids needless motions for reconsideration and appeal.  ***Id.***

¶49  Here, we conclude that Eisenga forfeited the issue by failing to timely raise it in the circuit court.  Eisenga was given notice that the court would consider the charging order at the February 2024 hearing, and as noted, it was undisputed that the essential requirements of WIS. STAT. § 183.0503 were satisfied.  *See* § 183.0503 (providing that a court "may" enter a charging order after a "judgment creditor" applies for one, but not mentioning a hearing requirement).  If Eisenga wanted to present evidence on why the court should decline to enter an order despite the requirements of § 183.0503 being satisfied, and if he believed that an evidentiary hearing was required, it was incumbent on Eisenga to ask for an evidentiary hearing.  As shown, Eisenga never submitted any evidence, nor did he assert that he was entitled to an evidentiary hearing until he filed his motion for reconsideration, which was after the court had already entered the charging order.

¶50  We also reject Eisenga's argument that an evidentiary hearing was required on the ground that this argument was merely an assertion and not supported with legal authority.  "To prevail on a motion for reconsideration, a movant must present either newly discovered evidence or establish a manifest error of fact or law."  ***Koepsell's Olde Popcorn Wagons, Inc. v. Koepsell's***

***Festival Popcorn Wagons, Ltd.***, 2004 WI App 129, ¶44, 275 Wis. 2d 397, 685 N.W.2d 853.  Here, although Eisenga's motion for reconsideration asserted that an evidentiary hearing was required, Eisenga did not cite any statute or case law to support that assertion.  The motion made reference to WIS. STAT. ch. 180, but that chapter does not govern limited liability companies and does not contain the statutory section that authorized the order here.  Given the absence of any on point legal authority in his motion for reconsideration, Eisenga does not persuade us that the circuit court made any manifest error of law or fact.

¶51     Before concluding on this topic, we briefly address a constitutional argument that Eisenga makes for the first time on appeal.  Specifically, Eisenga asserts that the circuit court's failure to hold a hearing violated his due process rights.

¶52     Generally speaking, we will decline to address an argument that a party advances for the first time on appeal.  ***Midwest Renewable Energy Ass'n v. Public Serv. Comm'n of Wisconsin***, 2024 WI App 34, ¶66, 412 Wis. 2d 698, 8 N.W.3d 848.  But even if we were to address this argument, we would reject it for reasons related to the ones we have explained above.  Due process requires adequate notice and an opportunity to be heard, ***Neylan v. Vorwald***, 124 Wis. 2d 85, 90, 368 N.W.2d 648 (1985), and here, Eisenga was given both.  Eisenga does not dispute that the notice he was given was adequate, and he had an adequate opportunity to be heard during the February 2024 hearing.  As we have explained, if Eisenga wanted to present some type of evidence for the circuit court to consider at that hearing, it was incumbent on him to ask for an opportunity to present that evidence.  We are not persuaded that the court violated Eisenga's due process rights by failing to hold an evidentiary hearing on its own initiative.

## II. Eisenga's Motion for a Modification

¶53    We now turn to Eisenga's motion to modify the child support floor, which the circuit court denied in its November 2024 order. Like the request for the charging order, the modification motion was addressed at the motion hearings held in October 2023, February 2024, and July 2024; but unlike the issues about the charging order, Eisenga timely requested an evidentiary hearing to present evidence in support of the factual allegations in his motion. As we now explain, we conclude that the reasons the court gave for denying the motion were erroneous, and we remand for further proceedings on the motion, including a determination by the circuit court about whether an evidentiary hearing should be held.

### A. Additional Procedural Background Regarding the Modification Motion

¶54    We begin with some additional background leading up to the circuit court's August 2024 decision, which denied Eisenga's motion for reconsideration. As noted, Eisenga's father filed a motion to modify the child support floor in February 2022 that was based on two alleged changes of circumstances: the fact that Eisenga was serving a prison sentence, and the allegation that his "current net worth [was] negative" and "there [was] insufficient cash flow in [his] businesses to continue to pay the child support currently ordered in this case." Eisenga first asked for an evidentiary hearing on his modification motion in a brief he filed with the circuit court in July 2023, after he had been released from prison.[5]

---

[5] In his appellate briefing, Eisenga asserts that he requested an evidentiary hearing in his 2022 motion, but that assertion is factually incorrect. We also observe that the brief filed by Hawthorne makes assertions about the circuit court proceedings without providing any citation to the record, *see* WIS. STAT. RULE 809.19(1)(d)-(e), and cites to per curiam opinions that cannot be

(continued)

22

¶55      The circuit court briefly addressed the pending motion during the October 2023 hearing.  In response to arguments about Eisenga's income, the court indicated that, based on its understanding of the arbitration decision and the court decisions on Eisenga's prior modification motions, any inquiry into substantial changes in circumstances should not focus on Eisenga's income; the inquiry should instead focus on his assets and whether they had reduced in value.  When Eisenga's counsel represented that "[t]he assets and the equity involved is next to nothing," the court responded "I'm going to stop you there for a second because that was not what the Court found after the trial in 2020 or whenever it was."  The court pointed out that it had given Eisenga an opportunity to prove a reduction in the value of his assets, but that the court did not credit the evidence Eisenga offered.  The court said: "So your thoughts that [Eisenga's assets are] worth nothing now are worth about that.  I don't know what they're worth at this point.  Again, it's conjecture.  I know the findings that I made previously and what the arbitrator previously found."  Counsel represented that Eisenga would retain an outside accounting firm to get appraisals of the assets to support his motion.

¶56      The circuit court next addressed the modification motion during the February 2024 hearing.  Eisenga's counsel represented that he had retained an expert from an outside accounting firm "to do some financial analysis," but her analysis was "in preliminary form at this point."  Therefore, although Eisenga could offer "preliminary testimony" on unspecified topics, the "report simply [was] not done yet" and he was not in a position to offer "final testimony."  In

---

cited as authority in any court of this state, *see* WIS. STAT. RULE 809.23(3)(a).  We remind counsel for both parties of their obligation to follow the rules of appellate procedure and that violations of those rules may lead to the imposition of sanctions.

response, Hawthorne argued that the motion to modify the child support floor should be denied regardless of any "changes in … assets and values." And the guardian ad litem who attended the hearing to represent the children's best interests appeared to argue that the court lacked authority to modify the floor, regardless of any reduction in the value of Eisenga's assets.

¶57     The circuit court deferred any decision on the motion, and asked for briefing on the legal issue that had been raised by the guardian ad litem—whether the court had authority to modify the child support floor. Both parties filed briefs that addressed this question, and also discussed the parties' respective positions on Eisenga's pending motion.

¶58     In his brief, Eisenga pointed out that Judge White's 2012 order specifically contemplated that the circuit court "retains the power to modify this award under limited circumstances." He further pointed out that one of the limited circumstances contemplated in the 2012 order would be if Eisenga's then-substantial separate estate, which had been the basis of the floor, was "deplete[d]," assuming that Eisenga was not "at fault in its reduction." Eisenga argued that his current "financial picture, including income and assets[,] is exactly [w]hat Judge White contemplated in 2012." More specifically, Eisenga argued that his outside accountant had reviewed the books, accounting records, and financial instruments of Eisenga's companies and had concluded that "changes to Mr. Eisenga's income and assets began long before any issue 'of [Eisenga's] own making.'"

¶59     Hawthorne's brief took a contrary position. She appeared to acknowledge that the circuit court had authority, albeit "limited," to modify the child support floor, but she argued that the court should not do so here because

Eisenga had raised "[a]n identical argument … in 2013 (and numerous times thereafter)," and that multiple courts "have summarily rejected such arguments." Hawthorne argued that the court could rely on the "plethora of evidence in the record" to reject Eisenga's assertions that there had been a substantial decrease in the value of his assets. Finally, Hawthorne asked the court to disregard Eisenga's representations about the accountant's conclusions because Eisenga "fail[ed] to offer th[e] Court any proof  [given that] no affidavits or reports were filed contemporaneously with his motion."

¶60    Then, two weeks after Hawthorne's brief was filed, Eisenga's counsel filed a letter that identified an additional reason to modify the child support floor—that the oldest of the parties' three children had reached the age of majority.  The letter stated: "This circumstance was specifically cited by Judge White when indicating valid reasons for eliminating the floor."  Counsel again asked for "the matter [to] be placed on for an evidentiary hearing, so that Mr. Eisenga may demonstrate that the circumstances are such that the floor should be removed and support should be recalculated."

¶61    The circuit court issued a notice for the July 2024 hearing, which indicated that the court would entertain "Oral Argument regarding child support." Then, on the afternoon of the scheduled hearing, Eisenga's attorney filed a document entitled the "Blau Himmel Asset Report," which purported to show the change in value of Eisenga's assets between the date of the divorce and December 31, 2023.  During the July 2024 hearing, the parties offered competing perspectives about what the court should do with this report and the extent to which the court could or should consider it.  The court indicated that it would not

consider the report unless and until it determined that it was within the court's authority to lower or eliminate the child support floor set in the arbitration award.[6]

¶62    Then, in November 2024, the circuit court entered an order denying Eisenga's motion to modify the child support floor. The court stated that its decision was based on the law of the case, as established by Judge White's 2012 decision and our decision in *Eisenga I*. More specifically, the court stated, the law of the case was that Eisenga "cannot now challenge the child support floor provision as contrary to public policy because he did not challenge the provision in front of the arbitrator, nor under the provisions pursuant to WIS. STAT. ch. 788." (Citing *Eisenga I*, No. 2013AP91, ¶19.)

¶63    As for the argument about the children's ages, the circuit court ruled that "[t]he language in the arbitrator's award is clear" and "unambiguous" and "expressly provides [for] termination 'when all three children' have met the termination criteria." The court stated that everyone was "aware that the children's ages ranged from two to five years old at the time of the arbitration decision and still the arbitrator determined that the child support payments should not end until the last of the three children reached the age of majority." Under the circumstances, the court concluded, "[n]o substantial change of circumstances is

---

[6] Following the hearing, the parties filed competing letters about what, if anything, the circuit court should do with the Blau Himmel Asset Report.

established based on the emancipation of one (or two) of the children of the parties."[7]

### B. Analysis of the Court's Decision on the Modification Motion

¶64    We review a circuit court's decision on a motion to modify child support to determine whether the court engaged in a proper exercise of discretion. *Zutz v. Zutz*, 208 Wis. 2d 338, 342, 559 N.W.2d 919 (Ct. App. 1997).  A court properly exercises its discretion if it examined the relevant facts, applied the proper legal standards and reached a logical decision.  *Id.*

¶65    Eisenga contends that the reasons the circuit court gave for denying the motion without a hearing are legally incorrect.  According to Eisenga, he is not asking for the child support floor to be stricken on public policy grounds, as the circuit court asserted.  He instead appears to argue that the "law of the case"—the interpretation that Judge White gave to the arbitration award in the 2012 decision—supports his motion for modification and that the circuit court erred in its application of the 2012 decision to Eisenga's current motion.  Specifically, Eisenga argues that Judge White decided as follows in 2012: in addition to determining that Eisenga had forfeited the right to challenge the child support floor, Judge White also determined that the floor does not violate public policy because the court retains limited authority to modify the floor under certain

---

[7] During the July 2024 hearing, Eisenga's attorney purported to raise yet another alleged substantial change in circumstances that the circuit court should consider—that Hawthorne had obtained employment outside of the home.  Hawthorne's attorney responded that Hawthorne's employment should not be considered a substantial change in circumstances because Hawthorne had been forced to obtain employment due to Eisenga's failure to pay child support.  The circuit court did not consider this allegation about Hawthorne's employment in its November 2024 decision, and we do not consider it on appeal.

circumstances. These circumstances include a substantial reduction of Eisenga's income or assets or a minor child reaching the age of majority. Eisenga contends that the circuit court erred in not considering or applying this part of the 2012 decision when it denied his motion without an evidentiary hearing.

¶66    We agree with Eisenga's arguments, at least in part. First, Eisenga's assertion that he is not challenging the child support floor on public policy grounds is accurate. Indeed, Eisenga's appellate brief concedes that he has forfeited any such argument. As mentioned, Eisenga is instead arguing that the circuit court should have given effect to Judge White's 2012 decision, based on what he submits would be a substantial change in factual circumstances that he can prove.

¶67    Second, we agree with Eisenga's argument that the circuit court retains the authority to modify the child support floor under limited circumstances. This is the interpretation that Judge White gave to the arbitration award, and we affirmed Judge White's decision on appeal. *See Eisenga I*, No. 2013AP91, ¶26. Accordingly, Judge White's interpretation is the law of the case.

¶68    Third, we agree with Eisenga's argument that one of the limited circumstances in which the child support floor could be subject to modification is if there was a substantial decrease in the value of Eisenga's individual assets. As Judge White explained, Eisenga "was awarded an extremely high amount of separate property under the prenuptial agreement …. Of course the court would be able to analyze what occurred to deplete his separate estate if a change in the floor was requested. Presumably, [Eisenga] could not be at fault in its reduction."

¶69    Fourth, to the extent that Eisenga is making the argument, we reject the assertion that the circuit court also retains authority to modify the child support

floor based on a reduction of his income. Judge White rejected this same argument in his 2012 decision. As the 2012 decision explained, a reduction in Eisenga's income would not warrant a modification of the child support floor because the floor was not set based on Eisenga's income; it was instead based on his substantial separate estate not included in the property division at divorce. It is worth noting that Judge Hepler drew this same distinction in his 2020 decision, when he denied Eisenga's 2018 motion.

¶70     Finally, we agree with Eisenga that the children's ages might also provide grounds for a modification of the child support floor. The circuit court's determination to the contrary was based on an interpretation of the termination provision in the arbitration award, but that provision may be reasonably susceptible to different interpretations. In any event, Judge White's 2012 decision expressly provided that, to the extent that the arbitration award could be interpreted as "not allow[ing] for reconsideration of support … upon any minor achieving the age of majority," that aspect of the award would be "considered null and void." Hawthorne did not appeal this determination by Judge White, and it, too, constitutes the law of the case.

¶71     For all of these reasons, we conclude that the rationale the circuit court gave for denying the motion without a hearing was legally incorrect, and therefore, that the court erroneously exercised its discretion.

¶72     That brings us to what should happen next. Hawthorne seems to be arguing that we can overlook any error in the circuit court's reasoning and affirm its denial of the modification motion without a hearing on alternative grounds. Specifically, she argues, the court could have denied the motion based on the evidence produced at the 2020 evidentiary hearing, which was held on Eisenga's

29

2018 motion; according to Hawthorne, Eisenga "had an opportunity to prove his case [in 2020] and squandered that opportunity."

¶73 We do not agree with Hawthorne's suggestion that the circuit court could deny Eisenga's motion outright based on the evidence or credibility determinations that predate Eisenga's 2022 motion. It is true that Eisenga may be precluded from attempting to relitigate matters that were litigated in 2020, but the evidentiary hearing that took place in 2020 did not, and could not have conclusively addressed the value of Eisenga's assets as of the date his 2022 motion was filed, or the date of any future trial to the court.

¶74 However, we also do not necessarily agree with Eisenga's assertion that he is absolutely entitled to an evidentiary hearing on remand. To determine how to proceed, the circuit court should evaluate whether Eisenga's motion and supporting evidence sufficiently allege a substantial change of circumstances consistent with this decision, WIS. STAT. § 767.59, and the prior court decisions in this case.

## CONCLUSION

¶75 For all these reasons, we affirm the orders the circuit court issued with respect to Hawthorne's motion for a charging order, we reverse the order denying Eisenga's motion for a modification of the child support floor, and we remand for further proceedings consistent with this opinion.

*By the Court.*—Order affirmed in part, reversed in part and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.